SST, INC., and The State of Minnesota by SST, Inc., Respondents,

v.

The CITY OF MINNEAPOLIS, Respondent.

OXFORD PROPERTIES U.S., LTD. and Oxford Development Group, Ltd., Respondents,

v.

Brett SMITH, Individually, and Friends of the Forum, intervenors, Appellants.

Nos. 50069, 50209.

Supreme Court of Minnesota.

Dec. 7, 1979.

Brett Smith, pro se.

Holmes, Kircher, Graven & Reyer, David L. Graven and Larry M. Wertheim, Minneapolis, for SST, Inc.

Robert J. Alfton, City Atty., and Allen B. Hyatt, Asst. City Atty., Minneapolis, for The City of Minneapolis.

Dayton, Herman, Graham & Getts, John H. Herman and Carolyn Chalmers, Minneapolis, for Oxford Properties U. S., Ltd., et al.

WAHL, Justice.

Friends of the Forum and their spokesman, Brett Smith, appeal from an order of the Hennepin County District Court allowing limited intervention and from an order approving the proposed settlement of the parties with regard to the fate of the old Forum Cafeteria, now "Scotties on Seventh." We do not decide what might have been. We can only conclude, on the record before us, that the efforts of those who sought to save this familiar Minneapolis landmark in its entirety were too little and too late. We affirm.

Plaintiff SST, Inc., the owner of the cocktail lounge, restaurant and disco known as "Scotties on Seventh," commenced this action in Hennepin County District Court under the Minnesota Environmental Rights Act (hereinafter MERA), Minn.Stat. § 116B, to enjoin the demolition, destruction, or any physical interference with "Scotties." After extensive discovery, trial began January 15, 1979. Twenty-two witnesses were called. The court received affidavits and heard testimony from a large group of expert witnesses knowledgeable about architecture and historic preservation, including the following: David Gebhard, Professor and Director of the University Art Gallery, University of California at Santa Barbara, president-elect, Society of Architectural Historians, author of numerous books regarding the art deco period; John Vinci, Restoration architect responsible for the removal and relocation of the Stock Exchange Trading Room from the Chicago Stock Exchange to the Chicago Art Institute; Gail Bronner, staff of the Minneapolis Heritage Preservation Commission; Russell Fridley, executive director of the Minnesota Historical Society and the State Historic Preservation Officer responsible for designating buildings to the National Register; Tom Martinson, principal City Planner and architectural historian; Karal Marling, Professor of Art History, University of Minnesota; Herbert Scherer, Art Librarian, University of Minnesota; Gunter Dittmar and Garth Rockcastle, both faculty in the school of Architecture, University of Minnesota; and Alastair Duncan, Cristies, New York, expert in art deco period.

The following facts were developed before the trial was continued for settlement negotiations:

The Scotties building, prior to its use as a disco, was used as the Forum Cafeteria. Minor structural changes were made by the owners of Scotties to convert the Forum into a disco in 1975. The Forum, the last of a chain of fast-food cafeterias built in the twenties and thirties, was built in 1929–30 in the shell of the Saxe Theatre. The interior is decorated with colored glass tiles and large etched mirrors, which, together with chandeliers and other decorative fixtures, constitute an excellent example of the "zigzag moderne" or "art deco" architectural style. Late in 1975, the interior was designated by the Minneapolis Heritage Preservation Commission as a city building worthy of preservation. At the recommendation of Russell Fridley, State Historic Preservation Officer, the Forum was placed on the National Register of Historic Places in March 1976, as a building of local historic significance. The National Register registers entire structures. The record is undisputed that the interior of the building is more remarkable and historically significant than the exterior, which dates from 1913 but has been substantially altered over time. Though the exterior is one of the last remaining examples in the Twin Cities of a Beaux Arts movie theatre facade, the fact that it has been altered and is therefore only a fragment of the original leads the experts to conclude that it is not architecturally or historically outstanding.

In 1975, the City of Minneapolis distributed a development plan for a retail, hotel, and office complex known as City Center to several developers, including defendants Oxford Properties U.S., Ltd. and Oxford Development Group, Ltd. (hereinafter "Oxford"). The City Center project area included the Forum/Scotties building. Oxford made a specific proposal to the City in

1975, which was accepted. As a result of extensive negotiations, a contract between the City and Oxford to build City Center was executed on August 5, 1977. This contract gave a one-year option to Oxford, during which the City agreed to submit the project for all necessary environmental reviews. If Oxford exercised its option, the contract provided that the City would acquire by condemnation all of the property necessary for the project. Except for the Scotties building, the City would demolish all of the buildings on the property. The land, along with clear marketable title, would then be conveyed to Oxford. Throughout the negotiations, both the City and Oxford intended that the art deco interior of Scotties would be removed and saved for reinstallation. The contract provided that the City would deliver clear title to the Scotties building and underlying land to Oxford with the Scotties building intact. Oxford would then have the choice between incorporating the building into the City Center project, removing the interior and reusing it within the new development, or providing for storage of the interior for reuse at another location downtown, by Oxford or anyone else.

Throughout 1975, 1976, and 1977, there was extensive news coverage of the planned project, and public hearings were held. During this period, the plans for City Center consistently showed the Forum/Scotties building would be removed to provide space for the Center, and no objection to the proposal was received.

In the fall of 1977, the City submitted the City Center plans to the governmental agencies responsible for reviewing its environmental impacts. The Environmental Assessment Worksheet was also distributed to public agencies concerned with the environment and historic preservation, including the Minnesota Historical Society. Public notice of the conclusions that the project would have no material adverse environmental impact was published in the *EQB*

*Monitor* on October 23, 1977, along with notice that comments would be received for 30 days thereafter. No objections were received. The Minnesota Pollution Control Agency reviewed the impact of the project on the Scotties building and found no potential for significant adverse effects. The Agency, after public notice and time for public comment, also approved an indirect source permit for the City Center in April 1978.

In the fall of 1978, Oxford presented the City with a set of architectural drawings for the City Center, which required demolition of the Forum/Scotties building. On October 18, 1978, SST, Inc. brought this action to permanently enjoin the demolition of any physical interference with Scotties. The plaintiff alleged that Scotties constitutes a valuable "historical resource under Minn.Stat. § 116B.02, subd. 4, and that a feasible and prudent alternative to the proposed condemnation is that the project be built around Scotties.[1] Notice of the commencement of the action was published in *Finance and Commerce* on October 26, 1978.

Trial began in Hennepin County District Court, on an expedited schedule, including special evening sessions. After hearing extensive testimony and making an on-site inspection of Scotties, the court continued the trial for settlement negotiations on January 23, 1979. The basic principles of settlement were submitted to the court on January 23, at which time the court and the parties returned to Scotties to inspect the premises and evaluate the adequacy of the settlement. The Minneapolis City Council approved the condemnation award and entered a stipulation with plaintiff SST on February 8, 1979. On February 20, 1979, all parties met with the court to review the terms of the proposed Stipulation of Settlement between Oxford and SST. At this time, Brett Smith, individually, and Friends of the Forum moved to intervene in this action, having obtained knowledge that the settlement, while saving the interior, would

---

[1]. Plaintiff's complaint contained other allegations, including a violation of the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*;

however, all but the MERA claim were dismissed by the court on December 7, 1978, and these rulings are not challenged on appeal.

entail the destruction of the building. The intervenors alleged that the Beaux Arts facade is an artistic and historical architectural structure in itself and that its destruction would mean the irreparable loss of the historical character of the Forum. Separating the interior and the exterior, they argued, would reduce the historical significance of the interior and jeopardize the placement of the structure on the National Register.

Plaintiff SST and the defendants opposed the intervention. The court, on March 9, 1979, ordered that intervention for the purposes of relitigating the merits of the action was untimely and prejudicial, but allowed intervention for the limited purpose of challenging the reasonableness of the settlement. The court requested the parties to expeditiously submit motions to the court regarding the permissible scope of inquiry and procedures for considering the settlement. Appellants failed to make any motion regarding the permissible scope of inquiry. At the hearing on defendants' motion, the court ordered the parties to submit all written materials for the court's consideration by April 9, 1979, and to appear for oral argument on April 11, 1979, at which time the court would expand the scope of inquiry (including the taking of evidence) if the written documents and oral argument indicated that it was necessary. Appellants failed to submit to the court by April 9, 1979, any written affidavits or memorandum supporting their view or requesting expansion of the scope of inquiry. Oral arguments of the parties regarding the reasonableness of the settlement were heard by the court on April 11, 1979.

On May 15, 1979, the court issued findings of fact, conclusions of law, and an order finding that only the interior of the building is a "resource" within the meaning of MERA, that the removal and reinstallation of the art deco interior will not have material adverse impact on its architectural value so long as the requirements of the court's order are complied with, and that the settlement among the parties is reasonable and consistent with MERA. An addendum order was issued on May 16, 1979,

setting out additional requirements by the court, including maintenance of jurisdiction until the final relocation of Scotties is accomplished. Oxford retained Dayton's Commercial Interiors to manage the dismantling under the supervision of an experienced restoration architect. On August 1, 1979, defendants moved the court for an order approving their relocation plan and approving the team assembled by Dayton's to do the work. Intervenor Smith appeared at the hearing and indicated no objection to the qualifications of the team. The court, on August 3, 1979, authorized the commencement of the removal and relocation pursuant to the plans submitted to the court. It also ordered weekly reports on the progress of the dismantling and regular site inspections by the court and Minneapolis Heritage Preservation Commission members.

1. The first issue to be decided is whether the trial court erred in limiting intervention to challenging the reasonableness of the proposed settlement. Brett Smith, individually, and Friends of the Forum moved to intervene pursuant to Minn.Stat. § 116B.09 and/or Rule 24, Minnesota Rules of Civil Procedure.

Minn.Stat. § 116B.03, subd. 1, provides that "[a]ny person residing within the state * * * may maintain a civil action in the district court for declaratory or equitable relief * * *." Subd. 3 of that section provides that the attorney general may intervene as of right and that "[o]ther interested parties may be permitted to intervene on such terms as the court may deem just and equitable in order to effectuate the purposes and policies set forth in section 116B.01." Minn.Stat. 116B.01 provides that " * * * each person is entitled by right to the protection, preservation and enhancement of * * * natural resources located within the state * * *." Thus, the court has broad discretion under MERA to grant or deny intervention. The trial court in this case attempted to determine what would be "just and equitable" by scrutinizing the timeliness of the motion and its prejudice to the original parties, factors to

be considered when deciding whether to grant permissive intervention under Rule 24.02.[2]

The timeliness of a motion to intervene must be determined on the basis of all the circumstances in each particular case. *Engelrup v. Potter*, 302 Minn. 157, 165, 224 N.W.2d 484, 488 (1974). The factors to be considered in determining timeliness include how far the suit has progressed at time of intervention, the reason for the delay, and the possible prejudice of the delay to the existing parties. *NAACP v. New York*, 413 U.S. 345, 366–69, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973).

Brett Smith, the brother of one of the current owners of SST, Inc., was a former owner and employee of Scotties. Friends of the Forum is a group created by Brett Smith which sought members by news advertisements. Smith knew of the proposed condemnation from its beginning, was aware of the settlement discussions for a month before moving to intervene, and was personally involved in many of the preparations for trial. He was present every day of the trial. Thus, this is not a case where the intervenor was unaware until judgment that his interests were about to be prejudiced and made prompt motion to intervene once he became aware of that possibility. *See Avery v. Campbell*, 279 Minn. 383, 157 N.W.2d 42 (1968); *Shlensky v. South Parkway Building Corp.*, 44 Ill. App.2d 135, 194 N.E.2d 35 (1963). Rather, the case more closely resembles *State Automobile and Casualty Underwriters v. Lee*, 257 N.W.2d 573 (Minn.1977), where the court denied permissive intervention as untimely when judgment had been entered and satisfied, intervenor knew about the commencement of the action, and it had no reasons for delaying the motion. The intervenor should not now, said the court, having waited to see if the decision would be favorable to its interests, be allowed to appeal a judgment which was binding on and satisfactory to the parties to the action.

There is sufficient evidence in the record before us to support the trial court's finding not only that full intervention was untimely but also that intervention would have caused substantial prejudice to the existing parties. Evidence was presented that delay in the construction of the City Center costs an estimated $8,595 per day. The parties agreed to an extremely short discovery period, an early and expedited trial and night sessions, all in order to avoid delay in the City Center project. Furthermore, if Smith were allowed full intervention, the parties would be forced to upset their settlement and continue the trial. No bond was required or posted.

Once the court determined that full intervention was inappropriate, it could exercise its discretion by allowing limited intervention if existing parties would not be prejudiced. 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1922 (1972). *See Natural Resources Defense Council v. Costle*, 183 U.S.App.D.C. 11, 561 F.2d 904 (D.C.Cir. 1977); *McDonald v. E. J. Lavino Co.*, 430 F.2d 1065 (5th Cir. 1970). Feeling that the rights of the intervenor could adequately be protected without unduly prejudicing the existing parties, the court allowed intervention for the purpose of challenging the proposed settlement. The court indicated that if a serious question was raised by the intervenors as to the reasonableness of the settlement, the court would consider motions to call further witnesses and to reopen the litigation. The court provided intervenors with the testimony of David Gebhard and indicated a willingness to provide testimony of other witnesses on a showing of need. The court also provided the intervenors with access to the court's own notes on the trial testimony. Thus, the court made every effort to allow the intervenors to present their case. However, no

2. Rule 24.02 provides as follows:
   Upon timely application anyone may be permitted to intervene in an action when an applicant's claim or defense and the main action have a question of law or fact in common. * * * In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

further testimony was requested, and intervenors failed to provide the court affidavits of any expert witnesses indicating the inappropriateness of the proposed settlement. Smith also appeared in August at the hearing where Oxford sought approval of its relocation plan, but he expressed no objection to the qualifications of the team.

■ The granting of intervention is clearly discretionary with the trial court and will not be reversed unless a clear abuse of discretion is shown. *Snyder's Drug Stores, Inc. v. Minnesota State Bd. of Pharmacy*, 301 Minn. 28, 221 N.W.2d 162 (1974). Under the facts of this case, the court did not abuse its discretion in granting limited intervention.

2. Appellants also challenge the court's approval of the settlement between the parties, alleging that the settlement violates MERA, is contrary to the evidence, and is unreasonable and inadequate. In brief, the settlement provides that Oxford, at its own expense, will dismantle, store, and later reinstall the interior of the Forum Cafeteria, that the interior will be reinstalled in the City Center project, maintaining the exact spacial dimensions of the original and located on the first floor on either a street frontage or, subject to court approval, on a major pedestrian area in the project. Furthermore, a full-service kitchen is to be installed, and the building is to be used as a restaurant. An experienced restoration architect must be retained to supervise the project.

■ MERA does not contain specific guidelines for courts in determining whether to approve settlements such as the one at bar. As we pointed out in *Minnesota Public Interest Research Group v. White Bear Rod & Gun Club*, 257 N.W.2d 762, 782 (Minn. 1977), MERA does not prescribe elaborate standards to guide trial courts but allows a case-by-case determination by use of a balancing test, analogous to the one traditionally employed by courts of equity, where the utility of a defendant's conduct which interferes with natural resources is weighed against the gravity of harm to the building resulting from such interference.

■ It is instructive to look at the standard applied to judicial approval of settlements in class actions. The standard in these cases is whether the settlement is fair, adequate, reasonable, and is not the product of collusion between the parties. *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977). The court must compare the settlement terms with the likely rewards the plaintiff would have received after a full trial. The trial court, absent a finding of fraud or collusion, should be hesitant to substitute its own judgment for that of counsel. *Id.* at 1330. Essentially, "[t]he evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2nd Cir. 1974). It must also be borne in mind that findings of fact by the trial court may be set aside on appeal only if this court on the entire record is left with the definite and firm conviction that a mistake has been made. *Minnesota Public Interest Research Group v. White Bear Rod & Gun Club, supra*, at 783.

■ The massive and detailed record in this case clearly supports the trial court's finding of fact and conclusions of law, including his finding that the settlement was fair, reasonable, and consistent with the public interest as expressed in MERA. It is significant that the settlement was reviewed and approved by the Minneapolis Heritage Preservation Commission, by the executive director of the State Historical Society, and by many of the experts called at trial with expertise in historical and architectural preservation. Though several of the experts had indicated an initial preference for preserving the building in its entirety, if possible, when faced with what one expert termed "the apparently inevitable decision to demolish the building," they considered the alternative provided by the settlement reasonable in light of the fact that it was the interior of the building which possessed the greater historical significance. Intervenors provided the court with no affidavits from experts in historic

preservation indicating the inappropriateness of the settlement. The court also required newspaper advertisements of the proposed court order approving settlement, inviting public comment. Thus, the court also considered the views of the public at large before approving the settlement.

Furthermore, the record indicates that both parties argued vigorously and that the proceeding was a true adversary one. It seemed reasonable that plaintiff would decide to settle, in view of the burgeoning weaknesses in its case, especially since Oxford firmly maintained that it would not build around Scotties. However, plaintiff did receive substantial concessions from Oxford, the principal one being that the interior would be saved and substantially improved, all at Oxford's expense.

Finally, the record reveals that the trial judge took great care throughout the trial to be a fair and informed participant in the case. He frequently asked questions of witnesses during the trial, he participated in evening sessions to expedite the case, and he participated in on-site inspections of the building. His order of May 15, 1979, exhibits a thorough understanding of the case. Furthermore, since he retained jurisdiction over the implementation of the settlement, he has been making regular inspections of the progress of the removal of the interior of Scotties. Thus, there is nothing in the record to indicate that the trial court did not give the case careful and unbiased attention.

The court may have concluded, as we here reluctantly conclude, that the following statement of Russell Fridley, State Historical Preservation Officer, encapsulates this difficult case:

> The Forum-Scotties building presents a case for historical preservation which is unusual. Generally speaking, historical buildings are significant because of both their exterior and interior. Federal and state programs, generally, however, give priority to preservation of exteriors. The interiors of these buildings are frequently renovated and remodeled for commercial or office use. The compromise of the interior is generally permitted in order to save the exterior of the building. The Forum-Scotties building is at the other end of the preservation spectrum in that the primary significance of this building is the interior. The exterior is of less architectural and historical significance. Where the interior of the building is the architecturally and historically significant component, moving that interior can be an acceptable compromise as a last resort for historical preservation.

We cannot say that the trial court abused its discretion. Affirmed.